CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED

03/05/2026

LAURA A. AUSTIN, CLERK
BY: /s/ Amy Fansler
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| CAMMIE W., | ) | |
| Plaintiff, | ) | Civil Action No. 5:25-cv-00009 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| FRANK BISIGNANO, | ) | By:   Joel C. Hoppe |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Cammie W. asks this Court to review the Commissioner of Social Security's

final decision denying her claim for disability insurance benefits ("DIB") under Title II of the

Social Security Act, 42 U.S.C. §§ 404–434. ECF No. 1. The case is before me by referral under

28 U.S.C. § 636(b)(1)(B). Having considered the administrative record ("R."), ECF No. 6, the

parties' briefs, ECF Nos. 13, 15, 16, and the applicable law, I find that the Commissioner's final

decision is not supported by substantial evidence. Accordingly, I respectfully recommend that

the presiding District Judge reverse the decision and remand Cammie's case under the fourth

sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*,

88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). *See Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019). Substantial-evidence review considers the entire record and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, a court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## II. The Legal Framework

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine if a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4).

The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. "At step five, the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy,' considering the claimant's residual functional capacity, age, education, and work experience." *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015) (quoting 20 C.F.R. §§ 416.920(a)(4)(v), 416.960(c)(2), 416.1429); *accord* 20 C.F.R. §§ 404.1520, 404.1560, 404.929. "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations" and vocational factors. *Mascio*, 780 F.3d at 635; *see Britt v. Saul*, 860 F. App'x 256, 263 (4th Cir. 2021) (citing *Mascio*, 780 F.3d at 636–37); *Jolly v. Barnhart*, 465 F. Supp. 2d 498, 504–05 (D.S.C. 2006). "If the Commissioner meets [this] burden, the ALJ finds the claimant not disabled and denies the application for benefits." *Mascio*, 780 F.3d at 635.

### III. Background

Cammie filed for DIB in December 2021. *See* R. 73, 184–85. She alleged that she had been disabled since August 1, 2016, because of fibromuscular dysplasia, headaches, intercranial hypertension, a brain shunt, spontaneous coronary artery dissection, small microvalve disease, heart disease with aorta aneurysm, depression, trouble concentrating, insomnia, tremors, osteopenia, and osteoarthritis in both knees. R. 199. Cammie was 49 years old, or a "younger person" under the regulations, on her alleged onset date. R. 73; *see* 20 C.F.R. § 404.1563(c). When she turned 50 in April 2017, however, she was considered a "person closely approaching advanced age." *See* R. 73; 20 C.F.R. § 404.1563(d). Virginia Disability Determination Services

3

("DDS") denied Cammie's claim initially in May 2022, R. 81, and upon reconsideration that September, R. 90. In September 2023, Cammie appeared with counsel and testified at a hearing before ALJ H. Munday. *See* R. 40–64. A vocational expert ("VE") also testified. *See* R. 64–70.

ALJ Munday issued an unfavorable decision on December 7, 2023. R. 17–32. She found that Cammie had not worked since August 1, 2016, and that she met the Act's insured-status requirements though December 31, 2021.[1] *See* R. 19. Cammie's numerous "severe" medically determinable impairments ("MDIs") during this period included: "History of spontaneous coronary artery dissection; Fibromuscular dysplasia; Intracranial hypertension; Cerebral aneurysm treated with coiling in August 2016; Stenosis of the internal jugular vein treated with stent in December 2016 and shunting in December 2018; and Migraines." *Id.* ALJ Munday also found that Cammie's "depression and anxiety" were "nonsevere" MDIs because they "did not cause more than minimal limitations in [her] ability to perform basic mental work activities." R. 20; *see* 20 C.F.R. § 404.1522(a)–(b).[2] Indeed, Cammie "had no limitation" in the broad areas of "understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing [her]self." R. 20 (citing R. 216–22, 281–82, 643–44, 646–49, 699–709, 1251–53, 1431–32, 1560–64, 1659–60, 1674, 1931–32); *see* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00A2b (describing the "paragraph B" broad areas of mental functioning).

---

[1] The latter date is Cammie's date last insured ("DLI"). *See* R. 73. To qualify for DIB, Cammie must prove she was "disabled" on or before her DLI. *Johnson*, 434 F.3d at 655–56; 20 C.F.R. § 404.101(a), 404.131(b).

[2] An MDI or combination of MDIs "is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). Basic work activities "mean the abilities and aptitudes necessary to do most jobs." *Id.* § 404.1522(b). Examples include understanding, remembering, and following "simple instructions"; exercising judgment; responding "appropriately" to supervisors, co-workers, and usual work situations; and dealing with changes in a "routine" work setting. *See id.* § 404.1522(b)(3)–(6).

At step three, ALJ Munday found that none of Cammie's severe MDIs "met or medically equaled the severity" of a listed impairment. R. 20. As relevant here, she concluded that "Listing 11.02b, which was considered because of [Cammie's] migraines, *is not met* because the record lacks documentation of recurrent migraine symptoms occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment." R. 21 (emphasis added) (citing R. 394 (Oct. 2020); R. 635–36 (Dec. 2021); R. 646–49 (Nov. 2021); R. 651–55 (June 2021); R. 657–60 (Dec. 2020); 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.02B; *see also* SSR 19-4p, 2019 WL 4169635, at *7 (Aug. 26, 2019) (discussing Listing 11.02B as applied to migraines).[3]

ALJ Munday evaluated Cammie's residual functional capacity ("RFC")[4] from August 2016 through December 2021. R. 21; *see* R. 22–31. She found that Cammie could have sustained full-time "sedentary work"[5] requiring "occasional" postural activities and exposure to vibrations, but never climbing ropes/ladders/scaffolds or working around "hazardous conditions, including unprotected heights and moving machinery." R. 21; *see* R. 29–32. This RFC finding does not

---

[3] Primary headache disorder, which includes migraine headaches, is not a listed impairment. SSR 19-4p, 2019 WL 4169635, at *7. "Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of primary headache disorder." *Id.* "While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed" in Listing 11.02B sufficient to support a finding that the disorder "medically equals the listing." *Id.* Listing 11.02B requires acceptable medical source ("AMS") evidence of "[e]pilepsy, documented by a detailed description of a typical seizure and characterized by . . . dyscognitive seizures (see 110.00H1b) occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)." 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.02B.

[4] "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular continuing basis"—i.e., for "8 hours a day, 5 days a week, or an equivalent schedule." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted).

[5] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). "Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations." SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996). "For the majority of individuals who are age 50 or older and who are limited to the full range of sedentary work," but who cannot return to their past relevant work, the Commissioner's regulations "require a conclusion of 'disabled'" at step five. *Id.*

restrict Cammie's capacities to do "skilled work,"[6] respond to stress, stay on task during an eight-hour workday, and/or complete a five-day workweek, R. 31, because the ALJ rejected specific medical and non-medical evidence supporting such limitations. *See* R. 22–23, 29–30; *accord* R. 20 (ALJ's step 2 finding that Cammie had "no limitation" in any paragraph B area and noting that the "mental [RFC] assessment used" at step 4 "reflects the degree of limitation" found at step 2).

At step four, ALJ Munday found that Cammie had past relevant work as a school counselor (DOT 045.107-010), which is "skilled work" that Cammie performed at the "light" exertional level, "but is generally performed at the sedentary exertional range." R. 31; *see* R. 66. Relying on the VE's testimony, she found that Cammie's sedentary RFC allowed her to meet "the physical and mental demands of this work" as generally performed. R. 31; *see* R. 66–69. Accordingly, ALJ Munday concluded that Cammie was not disabled at any time from August 1, 2016, through December 31, 2021.[7] R. 32. The Appeals Council declined to review the ALJ's decision, R. 1–4, and this appeal followed.

## IV. Discussion

Cammie makes three arguments on appeal. Pl.'s Br. 10. First, she asserts that ALJ Munday's listings analysis "used [an] improper legal standard" because she concluded that

---

[6] "Skilled work requires qualifications in which a person uses judgment to determine [and] . . . obtain the proper form, quality, or quantity of material to be produced." 20 C.F.R. § 404.1568(c). These "jobs may require dealing with people, facts, or figures or abstract ideas at a high level of complexity." *Id.*; *see* SSR 82-41, 1982 WL 31389, at *4 (Jan. 1, 1982) ("At the upper end of skilled work are . . . various professional and executive or managerial occupations.")

[7] ALJ Munday did not make any findings about Cammie's vocational factors of age, education, and acquired or transferable work skills. R. 31–32; *see generally* 20 C.F.R. §§ 404.1560, 404.1563, 404.1564, 404.1565, 404.1568. Nor did she evaluate whether, assuming Cammie could not return to her past skilled work as a school counselor, Cammie nonetheless could have adjusted to other work existing in the national economy considering her RFC and vocational factors. R. 31–32; *see* 20 C.F.R. pt. 404, subpt P, app. 2 §§ 201.14, 201.15.

Cammie's severe migraine disorder "did not meet Listing 11.02(B)," without *also* considering whether her "migraines medically equaled" that Listing's criteria. *Id.* at 13 (emphasis omitted). She correctly notes that a migraine disorder "can never 'meet'" a listed impairment because "[m]igranes are not a medical condition in the Listings." *See* Pl.'s Reply 2–3 (citing SSR 19-4p). Thus, ALJ Munday should have evaluated whether Cammie's migraine "disorder was equal in severity and duration to the criteria in listing 11.02B," *see* SSR 19-4p, 2019 WL 4169635, at *7, by considering the medical factors in SSR 19-4p, *see* Pl.'s Reply 3 (citing SSR 19-4p). Cammie asserts that ALJ Munday's Listings analysis did not use these factors at all.[8] Pl.'s Reply 3.

---

[8] Nonetheless, Cammie does not challenge ALJ Munday's step-three conclusion that her medical record "lacks documentation of recurrent migraine symptoms occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment," R. 21 (citing R. 394, 635–36, 646–49, 651–55, 657–60; 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.02B). *See* SSR 19-4p, 2019 WL 4169635, at *7 (listing the medical factors and evidence ALJs should consider "[t]o evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B"); *cf. Kiernan v. Astrue*, No. 3:12cv459, 2013 WL 2323125, at *5 (E.D. Va. May 28, 2013) ("In conducting his [Listings] analysis, however, the ALJ need not use any particular 'magic' words or follow a 'particular format.'" (quoting *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986)). In particular, Cammie "has failed to point to *any* specific piece of evidence not considered by the [ALJ] that might have changed the outcome of [her] disability claim," *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). *See* Pl.'s Br. 13–14; Def.'s Br. 7–8; Pl.'s Reply 2–3. This failure is fatal to her step-three argument in this court. *See Janell W. v. Kijakazi*, No. 22cv2339, 2023 WL 4456848, at *4 (D. Md. July 11, 2023) (citing *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." (cleaned up)); *cf. Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir. 1986) ("To be disabled under the Listings, . . . *the claimant must produce* evidence that the impairment meets or is medically equivalent to an impairment listed." (emphasis added)).

That said, ALJ Munday's two-sentence Listings analysis did not explain how she considered the SSR 19-4p factors in light of voluminous medical evidence related to Cammie's severe migraine disorder. *See* 20 C.F.R. § 404.1526(b)(2) ("[W]e will compare your findings with those for closely analogous listed impairments."). Cammie should be found conclusively "disabled" at step three if the medical-source evidence establishes that her migraine disorder "is equal in severity and duration to the criteria in Listing 11.02B," SSR 19-4p, 2019 WL 4169635, at *7. *See* 20 C.F.R. § 404.1520(d). Making this determination requires the ALJ to "consider: A detailed description from an AMS of a typical headache event, including all associated phenomena . . . ; the frequency of headache events; adherence to prescribed treatment; side effects of treatment . . . ; and limitations in functioning that may be associated with the primary headache

Second, Cammie challenges the ALJ's failure to include "any mental limitations" in the RFC despite finding that Cammie's migraines were a "severe" MDI. *See* Pl.'s Br. 16–20. She argues that ALJ Munday did not explain why she rejected her testimony describing how chronic migraine pain and fatigue severely limited her capacities to remember and apply information, concentrate, handle stress, stay on task, and maintain attendance. *See id.* at 16–18 (citing R. 50, 59, 216, 219, 221). An RFC limiting any one of these functions would establish that Cammie could not meet the "heightened" mental demands of being a school counselor. *See id.* at 16–20; *accord* R. 67–69 (VE's testimony); DOT 045.107-010, *Counselor*, available at 1991 WL 646621. Finally, Cammie asserts that ALJ Munday did not explain how she concluded that Cammie was physically capable of "sedentary" work. *See* Pl.'s Br. 21–23 (citing R. 21, 46, 54–55, 1799–1800, 1807).

Cammie's second argument is persuasive. While ALJ Munday's written decision does explain *why* she concluded Cammie's "statements [about] the intensity, persistence, and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record," none of "the reasons explained in [the ALJ's] decision," R. 29, passes muster. *See, e.g.*, *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 269 (4th Cir. 2017) ("[T]he ALJ must build an accurate and logical bridge from the evidence to his conclusion that the

---

disorder or effects of its treatment, such as interference with activity during the day." SSR 19-4p, 2019 WL 4169635, at *7. Cammie's treatment notes appear to document weekly headaches and associated functional limitations from August 2016 through at least early 2018 notwithstanding her adherence to increasingly more aggressive prescribed treatments. "Given the depth and ambivalence of the medical record," *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013), ALJ Munday's failure to explain *why* "the record lacks documentation of recurrent migraine symptoms occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment," R. 21, would make it impossible for any court to meaningfully review her conclusion. *See Radford*, 734 F.3d at 296. The Commissioner must carefully analyze this issue on remand.

claimant's testimony was not credible—which the ALJ wholly failed to do here." (cleaned up)).

Because the ALJ's symptoms analysis falls short, the court "cannot say that [s]he properly

assessed" Cammie's mental RFC. *Cf. Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656,

662 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520a). "And because [the court] cannot gauge the

propriety of the ALJ's RFC assessment, [it] cannot say that substantial evidence supports the

ALJ's denial of benefits." *Id.* The proper course here is to reverse the decision and remand for

further explanation. *See Radford*, 734 F.3d at 295.

A.      *The Legal Framework*

RFC is the claimant's "maximum remaining ability to do sustained work activities in an

ordinary work setting" for eight hours a day, five days a week despite her medical impairments

and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted). It is a holistic factual

finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller*

*v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), including clinical findings,

medical opinions, and the claimant's statements both to the agency and to her own healthcare

providers, 20 C.F.R. § 404.1545. *See Patterson*, 849 F.3d at 659 ("This RFC assessment is a

holistic and fact-specific evaluation."). The ALJ's actual RFC finding, 20 C.F.R. § 404.1520(e),

*must* "include those [functional] limitations that the ALJ considers credibly established" by

relevant evidence in the record, *Bryant v. Colvin*, No. 3:13cv349, 2014 WL 896983, at *1, *12

(E.D. Va. Mar. 6, 2014). *See Monroe v. Colvin*, 826 F.3d 176, 179, 188 (4th Cir. 2016).

The ALJ has broad (but not unlimited) discretion to determine if an alleged functional

limitation is supported by or consistent with other relevant evidence. *See Hines*, 454 F.3d at 464–

66; *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016)

(citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). The ALJ's decision need only

include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC determination, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining why the ALJ rejected inconsistent or contradictory evidence, *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 106 (4th Cir. 2020). A reviewing court will find the ALJ's RFC determination is supported by substantial evidence when she "applied the correct legal standards" and her decision "built an accurate and logical bridge from the evidence to her conclusion." *Shinaberry v. Saul*, 952 F.3d 113, 120, 123 (4th Cir. 2020) (cleaned up). "But when the ALJ's decision suggests that [s]he selectively examined the record and ignored countervailing evidence, *Lewis*, 858 F.3d at 869, or that [s]he mischaracterized the facts to buttress [her] conclusions," *Arakas*, 983 F.3d at 102, that decision is not supported by substantial evidence." *Stephen R. v. O'Malley*, No. 21-2292, 2024 WL 3508155, at *5 (4th Cir. July 23, 2024).

*

Cammie challenges ALJ Munday's analysis of her migraine symptoms, including fatigue, as part of the mental RFC determination. *See generally* Pl.'s Br. 14–20. "Symptoms mean your own statements describing your physical or mental impairment." 20 C.F.R. § 404.1502(i). The regulations set out a two-step framework for ALJs to evaluate symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability," *id.*, to work on a regular and continuing basis, *Mascio*, 780 F.3d at 639. The claimant's "symptoms . . . *will be determined* to diminish" her ability to work on such basis "to the extent

10

that [the] alleged functional limitations and restrictions" resulting from those symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence" in the record. 20 C.F.R. § 404.1529(c)(4) (emphasis added).

"The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects." *Lewis*, 858 F.3d at 866. In doing so, the ALJ must consider all evidence in the record bearing on the claimant's allegations that she is disabled by pain or other symptoms. *See* 20 C.F.R. § 404.1529(c). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5). *See* SSR 16-3p, 2017 WL 5180304, at *10–11 (Oct. 25, 2017). Her articulated reasons for rejecting a claimant's disabling symptoms need only be legally adequate and logically supported by an accurate characterization of the evidence she relied upon in concluding that the claimant's complaints were not credible. *See Brown*, 873 F.3d at 269 ("[T]he ALJ must build an accurate and logical bridge from the evidence to his conclusion that the claimant's testimony was not credible." (cleaned up)).

B.      *Summary of Relevant Evidence*

Cammie used to work as a public school counselor. R. 212–15. In this job, she "served as a resource for students, faculty, parents [and] other agencies" both "in person" and "over the phone [and] computer." R. 213. Cammie "met with, talked with, and provided information [and] support" for other people "all day long." *Id.* She used "technical knowledge or skills" to write, complete reports, and perform similar duties. *Id.* She also organized field trips and school events. R. 215. In December 2013, Cammie suffered a spontaneous coronary artery dissection ("SCAD") and heart attack. R. 215, 268. After this, she "had to give up" certain duties because

11

"[s]tressful events would exacerbate extreme fatigue and headache pain," R. 215. *See also* R. 284 (reporting "memory loss and difficulty concentrating, fatigue" (May 2015)); R. 302 (reporting "chronic daily headaches" (Mar. 2015)); R. 311 ("Her most debilitating symptoms now are her daily headaches and migraine." (Feb. 2015)); R. 1704 ("Has headaches every day—2-3 migraines each week, instead of 2-3 per year." (May 2016)).

In late 2015, Cammie took medical leave "because of physical and mental exhaustion." R. 216; *see also* R. 268, 1704. She went back to work in January 2016, but she "decided not to renew [her] contract, since [she] could not perform the functions of [her] job any longer without great physical and mental stress." R. 215; *see also* R. 268 ("I returned to work, still struggling with pain, fatigue, and excruciating headaches."). Cammie resigned that summer. R. 268, 1704; *see also* R. 1673 ("[S]he had resigned her job as a middle school counselor due to the stress and her headaches. She remains very frustrated."); R. 866 ("[S]he resigned from her position as a middle school counselor due to 'stress and health problems.'"); R. 888 ("She had been working as a middle school counselor, but had to stop working d/t headache, 'dizziness . . . balance issues, significant cognitive issues of word finding difficulties, speech arrest, short-term memory issues.'"). She never returned to work.

    1.    *Treatment Notes*

On June 24, 2016, Cammie saw Kenneth Liu, M.D., at UVA Health in Charlottesville to evaluate her chronic headaches. R. 1702. Dr. Liu noted that she had "a long history of severe headaches." *Id.* "Her symptom complex [was] fairly vague and include[d] cognitive issues and retroorbital pain." *Id.* Dr. Liu also noted Cammie's recent "MR angiogram . . . show[ed] a 3mm wide-necked anterior communicating artery aneurysm . . . fed by the dominant left anterior cerebral artery." *Id.* "[T]his places her at increased risk for a future subarachnoid hemorrhage,

especially given her young age." *Id.* He was "concerned about her symptoms and wonder[ed] if she ha[d] a touch of intracranial venous insufficiency." *Id.* Dr. Liu offered a catheter angiogram "to get a better look at the aneurysm" and evaluate "intracranial venous occlusive disease." *Id.*

On August 9, Cammie reported that "she continues to have daily generalized headaches" despite taking propranolol. R. 897. "The intensity waxes and wanes between 6–10/10." *Id.* "Exercise exacerbates them." *Id.* Cammie also reported "significant cognitive issues of word-finding difficulties, speech arrest, [and] short-term memory issues. So much so that she had to resign from her job as a middle school counselor." R. 898. Her memory, attention, concentration, speech, fund of knowledge, coordination, and sensation were all normal on that day's exam. R. 899.

On August 16, Dr. Liu performed a six vessel cerebral angiogram. R. 1698. He "was a little alarmed that the anterior communicating artery aneurysm appear[ed] to be larger" than what "non-invasive imaging" showed. *Id.* The angiogram also revealed "mild stenosis in the right transverse sinus associated with a 3 mmHg pressure gradient as well as stenosis in the right internal jugular vein associated with a 4 mmHg pressure gradient." *Id.* While Dr. Liu did "not think the presence of these pressure gradients [was] life-threatening, they could be contributing to an environment of cerebral venous hypertension which could be, in part, contributing to her [headache] symptoms." *Id.* She also "may have some impaired cerebrospinal fluid drainage and may respond to cerebrospinal fluid diversion." *Id.* Dr. Liu noted they "can test for this with a high-volume lumbar puncture." *Id.* Before treating Cammie's intracranial pressure, however, he wanted "to coil embolize her anterior communicating artery aneurysm to reduce her lifetime risk of subarachnoid hemorrhage." *Id.*

Dr. Liu performed the coil embolism on August 24, 2016. *See* R. 1689. Cammie was

13

discharged home the next day. *Id.* On September 15, Cammie "had a lumbar puncture to evaluate for elevated intracranial pressure" caused by "venous sinus stenosis in the setting of chronic headaches." R. 1673. "Following lumbar puncture, she reported worsening headache, particularly in the upright position[,] concerning for a CSF leak." R. 1669; *see also* R. 857. On September 21, she was readmitted to the hospital "to undergo blood patch and monitoring for resolution of [low-pressure] headache." *Id.*; *see* R. 1673. She was discharged the next day. R. 1699; *see* R. 1673 ("Her low-pressure headache is now resolved.").

On September 27, 2016, Cammie saw neurologist Andrew Southerland, M.D., for "chronic headaches," R. 1673, despite taking 20mg "propranolol for migraine prophylaxis" twice daily, R. 1675–76. Her husband came with her to help provide history. R. 1673. Dr. Southerland noted Cammie "continue[d] to describe . . . chronic headaches as beginning in the posterior, and radiating forward. There are migrainosus features but she says these are not always typical of her migraines." *Id.* On exam, she exhibited "[t]enderness to palpation in the occipital notch left-greater-than-right reproducing her posterior headaches." *Id.* Her orientation, speech, comprehension, sensation, and coordination were all normal. *Id.* Dr. Southerland referred her to pain management for occipital nerve injections, added gabapentin for occipital neuralgia plus Compazine/Benadryl as needed for "[e]pisodic migraine," and continued 20mg propranolol for migraine prophylaxis. *Id.* "If [her] headaches remained refractory, [he would] consider referral for Botox injections." *Id.* Cammie later told providers that the nerve blocks did not work. R. 811 (Feb. 2017); R. 1658–60, 1662 (Nov. 2016). She declined to try them again. R. 1660.

On October 21, 2016, Cammie told Dr. Liu that, while she was "doing well after her aneurysm coiling," she still had "severe pressure headaches and cognitive dysfunction. The spinal tap seemed to only help a little bit." R. 1667. Dr. Liu suspected that Cammie "may have

14

mild to moderate intracranial hypertension from outflow stenosis." *Id.* He "cautioned her against" having a "stent reconstruction to improve her intracranial venous outflow," however, because there was very little "evidence supporting or refuting this theory." *Id.* Cammie was "really at her wit's end and [wanted] to try something that does not involve a shunt." *Id.* Dr. Liu said he would do "a follow-up angiogram in February 2017. If this still suggests intracranial venous outflow stenosis, [he would] speak to her about a left internal jugular vein stent." *Id.*

On November 30, Cammie reported that propanol was "not entirely effective" for migraine prophylaxis. R. 1658. She tried gabapentin, but she was "unable to tolerate the medication. She has been intolerant of other medication" as well. *Id.*; *see* R. 811 (Feb. 2017). Cammie described headache "pain involving the occiput bilaterally for the past 6 months." R. 1658. "The pain is constant but of variable intensity." *Id.* That day, Cammie rated her pain an "8/10. The average pain level has been 7/10. The worst pain level has been 10/10." *Id.* She "describe[d] the pain as being continuous, throbbing, aching, shooting, stabbing and moderate" with "associated symptoms of numbness, weakness, tingling and pins/needles." *Id.* "Provocative factors include physical activity. The only palliative factors that she can identify [are] ice over the back of the had and rest." *Id.* "Conservative measures tried include activity modification." *Id.* On exam, Cammie exhibited normal coordination, attitude, mood, affect, attention, and concentration. R. 1660. A week later, Cammie reported "no complications" from the coil embolism, "however [she] continues with persistent and daily headaches. These episodes are very severe in nature and associated with dizziness." R. 845 (Dec. 6, 2016). "Her functional capacity has declined due to worsening fatigue and generalized weakness." *Id.*

On December 14, 2016, Dr. Liu placed a stent in Cammie's left "jugular vein, obliterating the pressure gradient which should theoretically help optimize her intracranial

venous outflow and hopefully help with her symptoms," R. 1654, including "headaches" and "brain fog," R. 1640. On December 21, Cammie told cardiologist Angela Taylor, M.D., that her "headaches are a little better but not resolved." R. 1634; *see* R. 1636. "[H]er fatigue is better." R. 1634; *see* R. 1636 ("Positive for malaise/fatigue."). She "continues to exercise" one week post-stenting. R. 1634. "Her husband accompanie[d] her" to this visit and said that Cammie "may be pushing it too much when she exercises." *Id.* Dr. Taylor "recommended that she not participate in yoga or similar activities and exercise at a low to moderate level only" so as not to "strain her neck." R. 1636. Otherwise, Cammie should return in one year. R. 1637.

On February 2, 2017, Cammie followed up with her vascular neurologist complaining of "neck pain and headache." R. 811. After the intrajugular stenting, Cammie "felt some relief in R sided neck pain going up to occiput . . . until about 2 weeks ago when [the] symptoms returned. These symptoms are similar to previous. She also has a different type of migraine headache that seems to have gotten better." *Id.* Ice and ibuprofen provided "some" headache relief. *Id.*

Cammie saw Dr. Taylor again on May 10, 2017, following multiple episodes of severe chest pain/pressure and shortness of breath. R. 797; *see* R. 801. These episodes were "similar to the symptoms connected to her SCAD in 2013." R. 797. Dr. Taylor noted Cammie was "visibly upset" on exam. *Id.* "[S]he wanted to be through all of this and did not want to have this happen again. She [was] clearly worried about another coronary dissection." *Id.* "Today, she describe[d] continued feelings of fatigue." *Id.* On exam, Cammie was "very anxious and upset that she [was] having issues." R. 800. Dr. Taylor ordered a PET scan and "stress [test] to rule out ischemia and microvascular disease." *Id.* Those tests "found a small dissection in [the] femoral artery. Everything else look[ed] good" from a cardiac standpoint. R. 791 (quotation marks omitted).

Cammie continued to report headaches and fatigue in June 2017. R. 791, 793. On July 25,

16

Dr. Liu performed a follow-up brain angiogram. R. 1590. "This demonstrated no residual or recurrent anterior communicating artery aneurysm." *Id.* The "internal jugular vein stent [was] also widely patent and without evidence of a pressure gradient." *Id.* Dr. Liu told Cammie to return in one year for another brain angiogram "to make sure there is no regrowth or recurrence of the aneurysm, as well as a MR venogram of the neck to look at her stent." *Id.* On November 14, Cammie told Dr. Southerland that she "continues to [have] headaches 3–4x/week. HA are throbbing, pounding, and . . . holocephalic" R. 764; *see also* R. 745 ("She currently experiences 30 headache days per month, at least half of which are migrainous. This is despite ongoing treatment with propranolol and nortriptyline." (citing R. 762–65)). Her speech, comprehension, sensation, and coordination were all normal on that day's exam. R. 764–65. Dr. Sutherland opined that Cammie's headaches "continue to be [consistent with] migraine with aura, refractory and too frequent despite some improvement with low does nortriptyline." R. 765. He doubled her daily dose of nortriptyline and recommended Botox injections "as a next therapeutic option." *Id.*

In early December 2017, Cammie told her other cardiologist, Aditya Sharma, M.D., that she had been exercising for seven weeks. R. 757. She took a 30-minute Zumba class twice a week and did resistance exercises. *Id.* Her headaches were "worse since [she] started exercising. She feels HA several hours after exercise. Ice, rest and sitting helps." *Id.* "She backed off from some resistance exercise when she noted the worsening HA and started doing the Zumba classes" instead. *Id.*; *accord* R. 761. Cammie also "wakes up at night with excruciating HA which is new for her. . . . She has doubled the dose of Nortriptyline for a month which has not helped." R. 757; *see* R 765. Cammie also reported "some improvement in HA after she had the jugular vein stent" in December 2016. She planned "to follow up with Dr. Liu (who now works in Pennsylvania)" because she felt like her current "'HA are due to her head not getting enough

circulation.'" R. 757. Dr. Sharma told Cammie "to avoid high resistance exercise which can increase arterial BP and [is] likely causing the worsening headache." R. 761.

In late December 2017, Cammie underwent a series of diagnostic imaging tests. *See* R. 753–54 (brain MRI); R. 1573 (head/neck CT angiogram); R. 1581 (abdomen/pelvis CT angiogram). Dr. Sutherland noted the brain MRI "show[ed] several small enhancing lesions in the left hemisphere with surrounding vasogenic edema . . . . as a result of her prior AComm aneurysm repair in August 2016." R. 753. "[A]n extensive review of the literature. . . describes this as a rare consequence of endovascular coiling, possibly as an allergic reaction to nickel or other metallic materials or as foreign body emboli." *Id.* Dr. Southerland shared this information with Cammie, but he wanted to consult "further with neurosurgery and neuroradiology prior to proceeding down a management plan." R. 754. The CT angiogram of Cammie's head/neck, which was ordered to evaluate "increasing frequency and severity of headaches," showed "[s]table changes" with "[p]atent intracranial arteries." R. 1573.

On February 26, 2018, Cammie saw Dr. Liu at Penn State Health in Pennsylvania. *See* R. 2567–69. He noted that Cammie "[d]id well initially" after the aneurysm coiling and stenting in 2016, "but now [her] symptoms appear to have returned." R. 2567. Dr. Liu "did not see any concerning findings" on the most recent imaging. *Id.* They discussed shunting to treat her intracranial hypertension, "as well as how craniocervical instability could be playing into her symptoms." *Id.* Cammie said she would think about the shunting. *Id.* In June, Cammie reported that she "had two rounds of Botox" injections, "which is helping the headaches." R. 1560. She still "[h]as headaches every day [with] 2-3 migraines each week instead of 2-3 per year." R. 1560–61. Cammie was alert and oriented with "[g]rossly normal motor skills and intact cranial nerves" on that day's exam. R. 1564. Cammie spoke with Dr. Liu again on November 1, 2018.

R. 2564–65. "She [was] continuing to have severe symptoms." R. 2564. Before going forward with the shunt, however, Cammie wanted "to rule out anything wrong with her stent or the possibility of other new stenoses." *Id.* Dr. Liu thought this was a "reasonable" approach and scheduled her for a "quick, limited catheter angiogram." *Id.* The angiogram showed a "[w]idely patent stent with no flow abnormalities," acute findings, pressure gradients, or evidence of junctional stenosis. R. 2556 (Nov. 29, 2018).

Cammie saw Drs. Sharma and Taylor on December 11, 2018. *See* R. 723–28, 1545–51. Dr. Taylor noted she had "done well" from a cardiac standpoint. R. 1545. "Her biggest issue is headaches and dizziness related to her increased cerebral pressure." *Id.*; *see* R. 1548 (reporting "malaise/fatigue," "difficulty with concentration, headaches and light headedness"). "She wakes up every morning with a headache. If she exercises, she gets nausea, dizziness, and a headache after only a few minutes." R. 1545; *see* R. 727 ("Migraine Headaches – continues to be worse after exercise."). Cammie had tried "several medications and botox" for "her cerebral issues." R. 1545; *see* R. 733. The lumbar puncture in September 2016 was "[t]he only thing that really gave her relief." R. 1545. Dr. Taylor cleared Cammie to proceed with surgery "[f]rom a cardiac standpoint." R. 1551.

Dr. Liu implanted a lumboartial shunt on December 28, 2018. R. 1527. Two days later, Dr. Liu surgically revised the shunt after it "malfunction[ed]." *Id.* Cammie was discharged home on January 2, 2019. *See* R. 1529. She could resume activity "as tolerated" as long as she did "not lift greater than 5 lbs." *Id.* Six weeks later, Cammie told Dr. Liu, "[s]he is doing fantastic" and "this is the best her brain has ever felt." R. 2546 (Feb. 18, 2019). Her X-rays "look good." *Id.*; *see* R. 2543–44. Dr. Liu said that Cammie could follow up as needed. R. 2546. In April 2019, however, Dr. Liu "spoke at length" with Cammie about the "risk of pulmonary embolus with an

atrial catheter." R. 2545. He offered to remove "the atrial portion of her lumbosacral shunt. [He] also gave her the option of keeping it as long as she understood the unknown risks associated with the shunt and as long as she stays on anticoagulation" medication. *Id.* Cammie chose "to keep it at this time." *Id.* If she ever changed her mind, Dr. Liu "would recommend removing the atrial catheter and the valve hardware and orphan the intrathecal catheter to reduce her risk of developing a CSF leak, which is common in this patient population." *Id.*

Cammie saw Drs. Sharma, Southerland, and Taylor on December 10, 2019. *See* R. 699–709. She reported that her headaches had "significantly improved" and she "ha[d] been feeling much better" over the past year. *See* R. 700. She still experienced "exercise induced shortness of breath and chest tightness." R. 706. She "is very nervous about exercising." R. 709. Cammie also endorsed "fatigue" and "headaches." R. 707. Dr. Sharma noted Cammie was "anxious" on that day's exam. R. 705. Other objective findings were normal. *See* R. 699, 703, 708. Dr. Taylor referred Cammie to cardiac rehabilitation to further evaluate her exertional symptoms. R. 709.

In July 2020, Cammie told Dr. Sharma that "[s]he had not had cardiac symptoms since receiving the stent but this spring her symptoms returned." R. 676 (July 13). "These symptoms were similar to those that pr[eceded] her SCAD" in 2013. *Id.* On July 7, 2020, Cammie went to the emergency department ("ED") with atypical chest pain and malaise. *See* R. 1465–66. Her cardiac workup was generally unremarkable. *See* R. 1466, 1472. The attending cardiologist noted Cammie's symptoms "seem[ed] to be related to an episode of profound fatigue and malaise which could be viral in etiology." R. 1466. He also opined that she "need[ed] to get back into some regular physical activity." *Id.* Cammie had joined a gym before the COVID-19 pandemic hit in early 2020, but "[s]he seemed to be making very slow progress" "doing some very light interval training with a personal trainer." *Id.* On July 12, Cammie went back to the ED with

20

radiating chest pain, shortness of breath, left-sided weakness, and headaches. R. 683. These symptoms were "the same as when she was diagnosed with SCAD," *id.*, "although of increased severity," R. 687. Cammie was "intermittently tearful and anxious" on exam, R. 687, but cardiac findings were unremarkable, R. 684–85. Given the lack of acute findings, the attending physician discharged her for outpatient follow up. R. 686. When Cammie saw Dr. Sharma again on July 13, she endorsed fatigue and headaches that were "different from prior migraines." R. 676.

Cammie had a nuclear stress test on July 29, 2020. *See* R. 1062–65. She exhibited "fair" exercise capacity and achieved an "exercise workload of 8.0 METS." R. 1064. She "reported chest discomfort, dizziness, shortness of breath, and headache" after three minutes. R.1064. This "was the same as the pain that led to the test." *Id.* Her stress electrocardiography ("ECG") testing was "negative for electrocardiographic evidence of myocardial ischemia," but diagnostic imaging revealed "probably abnormal" left-ventricle perfusion and "mild" to "moderate" reductions in uptake. R. 1062–63; *see also* R. 392 (noting Cammie's "abnormal nuclear stress" test). The interpreting physician opined that Cammie's "discordant" results were "nonetheless concerning for inducible myocardial ischemia given the known limited sensitivity of stress electrocardiography." R. 1064. A coronary CT angiogram ("CTA") in August 2020 showed no evidence of coronary stenosis or plaque, but did reveal a dilated ascending aorta. R. 391. The physician recommended repeating the study in one year. *Id.*

On September 1, 2020, Cammie saw Thomas Bashore, M.D., a specialist in adult congenital heart disease. *See* R. 385–93. She was "frustrated" because she was "still having some exertional chest pressure and dyspnea." R. 386. Her recurring fatigue remained "notably worse with exercise." R. 385. On exam, Cammie was "interactive," "well appearing and in no acute distress," and neurologically "appropriate." R. 389. Dr. Bashore planned cardiac catheterization

21

to "help define any residual dissection not seen on CTA." R. 392. He also gave Cammie a trial of long acting nitrates (Imdur) for her cardiac symptoms. *Id.* On October 27, Cammie reported the Imdur helped, "but she was unable to tolerate the medication as she has severe headaches." R. 394. She switched to amlodipine, which she "tolerated well" and resolved her cardiac symptoms. *Id.* Cammie also reported "improved fatigue overall." *Id.* The cardiac catheterization showed normal coronaries and a healed SCAD. *See id.* (Sept. 9, 2020)

Cammie returned to Dr. Sharma's clinic on December 8, 2020. R. 657. She reported "improvement in proximal episodes of fatigue" and cardiac symptoms after starting amlodipine. *Id.* However, she "recently had an incident with the shunt" and planned to see Dr. Liu. R. 663. Repeat cardiac imaging showed "no significant interval change" from prior studies. R. 661. Dr. Sharma told Cammie to follow up in one year. R. 663.

In June 2021, Cammie told another provider that amlodipine was "like a miracle drug" for her cardiac symptoms, and she was "now able to do more exercise." R. 652 ("biked and walked in [F]lorida"). She denied "significant headaches." R. 653. On November 2, Cammie saw Dr. Southerland "for biennial follow-up" regarding her chronic migraines. R. 646. "Thankfully, she [was] doing well" on 20mg propranolol twice daily. R. 647. Cammie had "not suffered any recurrent neurovascular symptoms or events" since her last visit in December 2019. R. 646. Her orientation, speech, comprehension, sensation, and coordination were all normal on that day's exam. *Id.* Dr. Southerland continued propranolol and instructed Cammie to follow up in one year. *See* R. 647.

On November 29, 2021, Cammie saw neurosurgeon Min Park, M.D., to follow her stent and shunt. R. 1363. She had "been doing very well since [these] procedures." *Id.* Her intracranial hypertension headaches were "significantly improved"; she had "occasional headaches," but they

22

were "manageable for her." *Id.*; *see* R. 642. Her orientation, language, sensation, mood, affect, and behavior were all normal on that day's exam. R. 643. Cammie saw Dr. Sharma on December 14, 2021. *See* R. 635. She reported "baseline[] fatigue/headaches/body aches" such that "if she has a lot of activity [she] can't do anything the next day." *Id.* Dr. Sharma instructed Cammie to follow up in one year. R. 641.

> 2.      *Cammie's Testimony*

Cammie filed for DIB in late December 2021. *See* R. 73, 184–85. As most relevant here, she alleged that she had been disabled since August 1, 2016, because of fibromuscular dysplasia ("FMD"), headaches, intercranial hypertension, a brain shunt, SCAD, and trouble concentrating. R. 199. With FMD, she "get[s] tired very quickly and [she has] to take frequent breaks to rest." R. 216; *see* R. 217–18, 220–21. She "get[s] very tired doing just about anything that requires physical or mental effort." R. 216; *see also* R. 220–21. She takes a two to three hour nap "almost" every day. R. 216; *see also* R. 217. Cammie suffers from "constant fatigue and chronic pain." R. 220. "[O]n days when [her] headache is very painful . . . , [she] can do very little except rest and try to get some pain relief." R. 216; *see also* R. 220. This happens "1–4 days a week." *Id.*; *see also* R. 219. It is "impossible" to drive on those days "because [her] head feels like it might explode from the intracranial pressure and [her] eyes cannot focus to see safely. There is nothing [she] can do because medication does not help." R. 216; *see also* R. 219. She must "sit and rest with ice packs" when she has a headache. R. 216; *see also* R. 270. Her intrajugular stent and lumbar shunt "help manage the severity, but [they] do not eliminate the symptoms." *Id.* She "can't exercise b/c of the pain and fatigue." R. 220. Several years ago, Cammie's husband took a different position in his company so he did not have to travel. R. 269. She relies on him to help at home and drive her places. *Id.*; *see* R. 217. In short, Cammie's "life is simply a 'cost/benefit'

evaluation every day." R. 270. "In order to manage/reduce pain, fatigue and headaches, [she] ha[s] to minimize physical and mental exertion, otherwise [she] suffer[s] greatly." *Id.* And, "more importantly," she puts herself "more at risk for a major medical event." *Id.*

Cammie described how her headaches and fatigue impact her capacities to understand and remember things, complete tasks, concentrate, follow instructions, and socialize. R. 221, 269. Her husband "comes into doctors' appointments to help [her] remember" things. R. 269; *see, e.g.*, R. 1728 (Mar. 2015); R. 855, 900–01, 1673 (June–Dec. 2016). She can pay attention for "1 hour or so," but only "[i]f fatigue and pain allow[]." R. 221. "It is difficult to think, concentrate, read, or focus for more than 15–20 minutes [because she] cannot maintain the energy it takes for very long anymore." R. 269. Her "memory . . . has diminished greatly. [She] can't remember things/names [she] could easily remember just 5 years ago." *Id.* She finishes what she starts, R. 221, but her activities of daily living are limited and take more time because of pain and fatigue. *See, e.g.*, R. 217–19 (personal care, household chores, shopping). It takes Cammie "longer" to follow written instructions because she needs "time to read and re-read and process the instructions." R. 221. She follows spoken instructions "OK." *Id.* She does not handle stress well. She tries "to minimize [these] situations" because stress exacerbates her fatigue and pain. *See* R. 222. Thinking, organizing her thoughts, and writing also take "much more time and energy" than before she left her job in 2016. *See* R. 268. Cammie explained that the stenting (August 2016) and shunt (December 2018) "helped about 50% but [she] was told that these [interventions] were just temporary and that they may need to be adjusted in the future." R. 269.

Cammie described the same symptoms and limitations at the hearing in September 2023. *See* R. 22 ("These limitations were reiterated in her hearing testimony."). She resigned from her job as a school counselor in 2016 because she "was having really, really bad headaches." *See* R.

24

49–50. That December, Dr. Liu inserted the intrajugular stent to "manage the headache pressure" and resulting pain. R. 50. This "helped about 50%." *Id.* But, Cammie was still "trying to deal with . . . the pain and the headaches, fatigue, brain fog," and memory problems. *Id.*; *see also* R. 51. She "couldn't do just basic tasks." *Id.* Her husband cooked, cleaned, and drove her places. *See* R. 50, 63–64. She napped for "two or three hours" every day. R. 59. She spent most of her energy just trying to manage her "rare" and complex connective tissue disorders. *See* R. 60–61.

In December 2018, Cammie "ended up getting the shunt . . . because the headaches . . . were getting worse again." R. 50–51. These symptoms started much earlier, but it "took about a year and a half" to schedule an angiogram with Dr. Liu at Penn State. R. 51. Cammie explained that the shunt is "a tube that comes out of [her] lumbar section and . . . goes into a contraption that's in [her] abdomen that's like a syphon, so it syphons the cerebral shunt spinal fluid." R. 54. This "helped about 50%" with her headache symptoms. R. 55; *see also* R. 54. Rather than having headaches "seven days a week, 24 hours day," it was now only "five days a week." R. 55–56. Cammie's pain before the shunt was "15" on a scale of one to ten. R. 56. Afterwards, it was "8.5, you know, about 50% improvement." *Id.* The headache was still "constant, the severity of it just wasn't as bad." *Id.*; *see also* R. 54. This limited her ability "to think and see clearly and just comprehend even what somebody [was] telling [her]." R. 56.

3.    *VE Testimony*

Vocational expert Shelia Capizzi, M.A., testified at the ALJ hearing. *See* R. 64–70, 264. Ms. Capizzi explained that Cammie's past relevant work is a counselor (DOT 045.107-010) which "is a sedentary job with an SVP of 7." R. 66. "It's a very specialized job" in which "you don't have a lot of at will" time. R. 67. "You're doing the certain things at the time you have to do them." *Id.* Limiting a person to "simple, routine tasks . . . would eliminate" this work. R. 68–

69. The ALJ asked Ms. Capizzi about a person's employment prospects if, "due to impairments, symptoms, and limitations," this person would: (1) need unscheduled breaks during the day above and beyond regularly scheduled breaks and lunch; (2) be off task 20% of the time; and/or (3) have two unplanned absences per month. R. 69. Ms. Capizzi testified that any one of these limitations would preclude all competitive employment. *See id.*

C.      *The ALJ's Decision*

ALJ Munday referenced some of the above evidence in her written decision. *See* R. 22–29 (citing R. 49–64, 216–22, 306, 385, 391, 394, 643–44, 646–47, 652–53, 699–709, 1062–65, 1363, 1465–66, 1472, 1528–31, 1560–64, 1573, 1581, 1610–14, 1634–37, 1640, 1654, 1658–60, 1662, 1673–74, 1689, 1698, 1704, 1728). She considered the allegedly disabling symptoms that Cammie attributed to "chronic migraines and fibromuscular dysplasia," R. 22–23, as part of the RFC assessment. *See* R. 29–30. Her summary of "the alleged symptoms," R. 29, cites Cammie's statements that:

> [H]er fatigue and headaches require her to take naps every day lasting for two to three hours; her medications do not resolve these symptoms and she must sit and rest with ice packs when experiencing a headache (4E). She also reported that she cannot focus to drive when she has these symptoms (4E). She can attend to her personal care needs but it takes longer due to lack of strength, poor energy, and pain (4E). She also indicated difficulty with . . . remembering, completing tasks, concentrating, understanding, and following instructions (4E).

R. 22 (citing R. 216–17, 221). ALJ Munday also noted Cammie "reiterated" the above functional limitations at the hearing:

> The claimant specifically testified that her surgeries, specifically her shunt placement in 2018, only partially alleviated her pain and she still struggles to manage her pain and fatigue. She testified that her husband ended up changing jobs so that he could be closer to home because she has daily issues with pain, fatigue, and brain fog. *She testified that, prior to having her shunt, she had headaches 15 times a week and her pain level was about 8.5 out of ten but after this improved to five headaches a week.*

26

*Id.* (emphasis added). *But see* R. 55–56 ("It helped about 50%, so rather than seven days a week, 24 hours a day, it was, you know, five days a week. So if someone said on a scale of one to ten what's your pain prior to the shunt, you know, 15. After the shunt, . . . 8.5, you know, about 50% improvement."). ALJ Munday acknowledged at the outset Cammie's "medical record indicates that [she] has chronic migraines and fibromuscular dysplasia . . . for which she has undergone multiple diagnostic tests and treatments since" August 2016. *Id.* "However, as described below, [she concluded] the record does not indicate that [Cammie's] symptoms cause such chronic daily limitations that she could not attend to full-time work within the provided [sedentary] residual functional capacity." R 22; *see* R. 21, 31. To the contrary, "the record indicates that [Cammie's] symptoms have stabilized since her alleged onset date and have not caused exacerbations that are as severe and frequent as suggested by her hearing testimony." R. 22–23.

ALJ Munday then summarized the evidence she found credible, useful, and consistent. *See* R. 23–30. She concluded that Cammie's MDIs "could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical and other evidence in the record for the reasons explained in [her] decision." R. 29. The ALJ's decision contains three apparent reasons why she rejected Cammie's "statements about the intensity and frequency of her headache pain and fatigue," at least to the extent those statements "suggest that she could not maintain a full-time work schedule in the sedentary exertional range." R. 29; *accord* R. 22, 31.

First, Cammie "had prolonged periods of symptom stability after her coiling procedure in August 2016 and then after her stent placement in December 2016." R. 29 (citing R. 1634–38). After the stent, "[s]he did not require acute care for symptoms again until May 2017 and even then, her imaging revealed stable findings." R. 29–30 (citing R. 1543, 1573, 1581). "Surgical

27

intervention was not required again for about two years when [Cammie's] shunt was placed in December 2018." R. 30 (citing R. 1528–31). "Notably, [Cammie] was stable after this procedure and experienced even greater improvement after starting amlodipine and having a left heart catheterization in September 2020. . . and only required annual follow-up with her treating specialists." *Id.* (citing R. 394, 635–36, 646–49, 651–55, 657–60). Second, Cammie reported "resuming regular exercise" on December 21, 2016, and June 30, 2021. *See* R. 29–30 (citing R. 1634, 652). Third, "even while [Cammie] was describing daily headaches, her exams did not align with her reported issues with cognition, strength, stamina, and balance. Apart from acute episodes of gait impairment . . , [she] was observed as having intact gait, strength, memory, and comprehension as well as normal mood and affect, and normal coordination." *Id.* (citing R. 281–82, 643–44, 646–47, 699–709, 1251–53, 1431–32, 1560–64, 1659–60, 1674, 1931–32).

At step four, ALJ Munday found that Cammie used to be a professional counselor (DOT 045.107-010), which is generally considered "skilled" sedentary work. R. 31. "In comparing" Cammie's RFC "with the physical and mental demands of this work," she found that Cammie could have done this work "as generally performed." *Id.* Accordingly, ALJ Munday concluded Cammie was not disabled at any time from August 1, 2016, through December 31, 2021. Her written decision contains no discussion or findings about the actual "mental demands" of being a full-time counselor, SSR 82-62, 1982 WL 31386, at *3–4 (Jan. 1, 1982). *See, e.g.*, R. 67–69 (VE's testimony); R. 49–50, 213–15, 268, 866, 888, 898, 1673, 1704 (Cammie's statements); DOT 045.107-010, *Counselor*, available at 1991 WL 646621.

D.    *Analysis*

Read as a whole, ALJ Munday's RFC assessment implies a conclusion that Cammie's numerous severe MDIs—including migraines, FMD, and intracranial hypertension with stenosis

28

status-post stenting and shunting—restricted Cammie to sedentary work, but did not affect her mental stamina, complex comprehension, memory, judgment, stress tolerance, or workplace attendance. R. 19–23, 29–31; *see* 20 C.F.R. § 404.1568(c) ("[S]killed jobs may require dealing with people, facts, or figures or abstract ideas at a high level of complexity."). The VE's testimony establishes that an RFC limiting *any one* of these functions would show that Cammie could not have performed the "heightened" mental demands of being a school counselor from August 2016 through December 2021. *See* Pl.'s Br. 16–20; *accord* R. 67–69. Cammie repeatedly described significant, ongoing limitations in all four areas resulting from chronic headache pain, fatigue, and brain fog. Pl.'s Br. 16–19 (citing R. 50, 59, 216, 219, 221); *see also* R. 49–51, 54–56, 63–64, 215, 217, 220, 222, 268–70, 284, 635, 845, 888, 898, 1548, 1640, 1667, 1673, 1702, 1704. The ALJ's reasons for rejecting Cammie's statements do not survive substantial-evidence review. *See, e.g.*, *Brown*, 873 F.3d at 269 ("[T]he ALJ must build an accurate and logical bridge from the evidence to his conclusion that the claimant's testimony was not credible—which the ALJ wholly failed to do here." (cleaned up)).

*First*, ALJ Munday did not explain why Cammie's testimony describing the debilitating "intensity and frequency of her headache pain and fatigue" was inconsistent with cited treatment records showing Cammie "had prolonged periods of symptom stability" after embolism coiling and intrajugular stenting in August 2016 and December 2016, respectively. *See* R. 29 (citing R. 1543, 1573, 1581, 1634–38). Presumably, the ALJ was using "stability" to imply that Cammie's symptoms improved to good, or at least manageable, after these procedures. R. 29–30; *see, e.g.*, R. 25 ("[O]n December 21, 2016, she indicated that her headaches were not resolved but they were better than they were prior to stenting, and she also indicated that her fatigue was improved." (citing R. 1634)); R. 26 ("[Cammie] next received care for her symptoms in May

29

2017." (citing R. 1610)). "[A] finding of stability does not indicate that a function or condition is good, but instead merely that its status—whatever it might be—is unchanged from some prior time." *Sanders v. Colvin*, No. 5:13cv790, 2015 WL 736088, at *9 (E.D.N.C. Feb. 20, 2015) (collecting cases). Cammie's symptoms could "be both 'stable' and disabling at the same time." *Hemminger v. Astrue*, 590 F. Supp. 2d 1073, 1081 (W.D. Wis. 2008).

Indeed, Cammie frequently told providers that her headache pain and fatigue stayed the same (or got worse) after the 2016 procedures. *See, e.g.*, R. 845, 857, 1167, 1634, 1658, 1669, 1673–75 (Sept.–Dec. 2016); R. 745, 764–65, 791, 793, 797, 811, 1573, 2564–65 (Feb.–Dec. 2017); R. 1545, 1560–61, 2567 (Feb., June & Dec. 2018). In November 2017, Dr. Sutherland opined that Cammie's headaches "continue to be [consistent with] migraine with aura, refractory and too frequent despite some improvement." R. 765. He noted these symptoms might be "a rare consequence of [the] endovascular coiling" and said that he wanted to consult "further with neurosurgeon and neuroradiology" before committing to "a management plan." R. 753–54. In June 2018, Cammie reported continued "headaches every day [with] 2–3 migraines each week instead of 2–3 per year." R. 1560–61; *accord* R. 302, 306, 311, 745, 764, 845, 897, 1658, 1704 (reporting "daily" or "constant" headaches in 2015, 2016, and 2017). That November, she told Dr. Liu she was "continuing to have severe symptoms." R. 2564. ALJ Munday did not explain how any of this medical evidence—most of which she did not mention—showed that Cammie's symptoms were not "as severe and frequent" as she alleged, R. 22–23, 29. *Cf. Lewis*, 858 F.3d at 869 ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts to support a finding of nondisability while ignoring evidence that points to disability finding.").

ALJ Munday also found that, after Cammie got the stent in December 2016, "[s]urgical intervention was *not required again* for about two years when [the] shunt was placed in December 2018." R. 30 (emphasis added). ALJs may consider the nature, extent, and efficacy of

30

medically appropriate treatment as one factor in evaluating the extent to which the claimant's testimony about the intensity, persistence, and functionally limiting effects of her symptoms can reasonably be accepted as consistent with other relevant evidence in her record. *See* 20 C.F.R. § 404.1529(c)(3); *Arakas*, 983 F.3d at 102; *Dunn v. Colvin*, 607 F. App'x 264, 274–75 (4th Cir. 2015). But they must consider that factor in context—especially where, as here, the record suggests the claimant "required more aggressive treatment yet received conservative treatment for other reasons," *Dunn*, 607 F. App'x at 275. It is true Dr. Liu *performed* a third neurosurgery in December 2018. *See* R. 1527. But, he and Cammie appear to have *discussed* this procedure as early as October 21, 2016, when Cammie reported she "continues to have severe pressure headaches and cognitive dysfunction." R. 1667 ("She is really at her wit's end and would like to try something that does not involve a shunt."); *see also* R. 51 (Cammie's testimony that it "took about a year and a half" to schedule the shunt procedure). Dr. Liu again offered shunting to treat Cammie's intracranial hypertension in February 2018. R. 2567. Cammie said she would think about it, *id.*, while also trying "several medications and botox" injections to manage her "cerebral issues," R. 1545; *see, e.g.*, R. 733, 765, 811, 1650, 1658. Over the next ten months, Cammie "continu[ed] to have severe symptoms" while using those non-surgical treatments. R. 2564. In November, she asked Dr. Liu "to rule out anything wrong with her stent or the possibility of other new stenoses" before agreeing to surgery. *See id.* Dr. Liu thought this was a "reasonable" approach. *Id.* Cammie had the shunt implanted after tests showed "[w]idely patent stent with no flow abnormalities," acute findings, pressure gradients, or evidence of junctional stenosis. R. 2556. Accordingly, substantial evidence does not support ALJ Munday's finding that "[s]urgical intervention was not required again for about two years" after intrajugular stenting in December 2016. R. 29–30; *cf. Hines*, 453 F.3d at 566 ("The deference accorded an ALJ's

findings of fact does not mean that we credit even those findings contradicted by undisputed evidence."). Even if it did, her decision does not build an accurate and logical bridge from the surgical record she cited, R. 1528–31, to her conclusion that Cammie's "statements about the intensity and frequency of her headache pain and fatigue" from 2016 through 2018 were not credible because of the timing of the surgery, R. 29. *Cf. Testamark v. Berryhill*, 736 F. App'x 395, 399 (4th Cir. 2018) (reaching the same conclusion where "the ALJ's opinion seize[d] on insignificant inconsistencies in the treatment record while overlooking the record's broader import").

*Second*, ALJ Munday concluded that Cammie's "reported activity level . . . [did] not suggest that she could not maintain a full-time [skilled] work schedule in the sedentary exertional range." R. 29. In support, she found that Cammie "endorsed resuming regular exercise" on December 21, 2016, and June 30, 2021. R. 29–30 (citing R. 1634, 652). "That is simply untrue," *Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 355 (4th Cir. 2023). In December 2016, Cammie denied "chest pain and *continues* to exercise" one week after the stenting. R. 1634 (emphasis added). The record contains no information about the nature or extent of this exercise. *Cf. Arakas*, 983 F.3d at 101 ("An ALJ may not consider the *type* of a claimant's activities without also considering the *extent* to which she can perform them."). "In the same medical records containing the [information] relied upon by the ALJ," *Lewis*, 858 F.3d at 869, Cammie's husband told Dr. Taylor that "she may be pushing it too much when she exercises," R. 1634. And Dr. Taylor recommended "low to moderate exercise" and advised against "yoga or similar activities that strain her neck." R. 1637. ALJ Munday did not mention these qualifying statements. *Cf. Brown*, 873 F.3d at 263 (reversing and remanding where the ALJ's "adverse credibility finding . . . noted that Brown testified to daily activities that included 'cooking,

32

driving, doing laundry, collecting coins, attending church and shopping,'" but it "did not acknowledge the extent of those activities described by Brown").

In June 2021, Cammie reported that starting amlodipine allowed her "to do more exercise" because her heart was not "pumping so hard," R. 652. She said that she "biked and walked in Florida," but she did not say how frequent or demanding those activities were. *See id.* Before this visit, Cammie often reported that exercise "exacerbates" her chronic headaches and fatigue. *See, e.g.*, R. 220, 385, 706–07,727, 757–61, 897, 1064, 1545. By December 2021, she was suffering from "baseline[] fatigue/headaches/body aches" such that "if she has a lot of activity [she] can't do anything the next day." R. 635. ALJ Munday did not explain why Cammie's reported ability to "bike and walk" in June 2021 showed that she could sustain full time skilled work from August 2016 through December 2021. R. 29–31; *cf. Arakas*, 983 F.3d at 101 ("A claimant's inability to sustain full-time work due to pain and other symptoms is often consistent with her ability to carry out daily activities."). Moreover, her conclusion that this isolated report was "not entirely consistent" with Cammie's testimony "about the intensity and frequency of her headache pain and fatigue," R. 29, is "not supported by substantial evidence because the record, when read as whole, reveals no inconsistency between the two," *Hines*, 453 F.3d at 565. Cammie could suffer from the daily headaches, extreme fatigue, and cognitive dysfunction that she described in her testimony, R. 22 (citing R. 50, 55–56, 63–64, 216–22), and still "exercise" during the five-year period. *Cf. Arakas*, 983 F.3d at 101 ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations.").

*Third*, ALJ Munday doubted that Cammie's symptoms were "as severe and frequent as suggested by her hearing testimony," R. 23, because "even while [Cammie] was describing daily headaches, her exams did not align with her reported issues with cognition, strength, [or]

33

stamina," R. 30 (citations omitted). The cited exams show that Cammie had "intact . . . strength, memory, and comprehension as well as normal mood and affect, and normal coordination." R. 30. ALJs should consider relevant objective findings as one factor in evaluating the extent to which the claimant's symptoms can reasonably be accepted as consistent with other evidence in her record. *See* 20 C.F.R. § 404.1529. "However, [they] will not reject [subjective] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [those] symptoms have on [her] ability to work *solely* because the available objective medical evidence does not substantiate [the] statements." *Id.* § 404.1529(c)(2) (emphasis added). ALJ Munday found that Cammie's MDIs "could reasonably be expected to cause the alleged symptoms" that Cammie described in her testimony. R. 29. Having made this threshold showing, Cammie "was entitled to rely exclusively on subjective evidence to prove . . . that [her] pain is so continuous and/or so severe," *Hines*, 453 F.3d at 565, that it prevented her from going back to work full time as a school counselor. *See* Pl.'s Br. 16–20. Thus, ALJ Munday's reliance on generally normal exam findings is not a legally adequate basis to reject Cammie's testimony about her chronic headache pain and fatigue. 20 C.F.R. § 404.1529(c)(2).

V. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or

34

specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: March 5, 2026

Joel C. Hoppe
United States Magistrate Judge

35